IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Lena Lasher, Plaintiff

Civil Action No. 17 CV 6388 (LTS)(BCM)

v.

17 - 1546   Per

Board Chairperson Theresa M. Talbott, "individually and in his official capacity", et al DEFENDANTS

Plaintiff's notification to the Court of the Remaining Discovery Issues

to Comply with the Court December 16, 2019 Order

Now comes the Plaintiff, Lena Lasher, through pro-se representation, hereby respectfully notifying the

Court of the Remaining Discovery Issues.  The Production of documents are relevant in connection with Civil

Action No. 17 CV 6388 (LTS)(BCM) as demonstrated in Exhibit A - Reasons why the Production of documents

are relevant, Exhibit B - Letter to Attorney Deibert as to why she unconstitutionally objected to the Plaintiff's

request for discovery because the discovery would aid in the Plaintiff's defense and prove that the Pennsylvania

Board of Pharmacy DID discriminated against her which is made obvious by the way the Board dealt with

Pharmacist Steven Goloff.

The Defendants sent the Court irrelevant "new documents" on October 1, 2019 (Goloff's testimony at

the Plaintiff's trial which can be shown to be perjured testimonies as per the previously suppressed exculpatory

video recordings  evidence of the pharmacy), which is their attempt to confuse and deceive the court. The "new

documents" sent by Attorney Deibert will actually show the Court why this current lawsuit has merit and that the

Plaintiff's assertions is nothing but the truth and backed up with the LAW.  The Plaintiff is now sending the

Court the Inspector Bat's testimony at the Plaintiff's trial, see Exhibit C, to clarify Goloff's testimony. Inspector

Bat's testimony alone is enough to prove the Defendants' continuing deception in revoking the Plaintiff's license

without her knowledge, as detailed in Exhibit A.

Pursuant to Federal Rules of Civil Procedure 33 and 34, the Plaintiff hereby request the Defendants to

produce the documents described herein, in accordance with the provisions of Federal Rules of Civil Procedure

26 and 34 and the enclosed instructions.

**DOCUMENTS** requested

1. Provide Proof that the Defendants informed the Plaintiff of the "Revoke Order" by way of the Certified Mail

Signature Return Receipt. *Because the Defendants cannot provide the Plaintiff's Proof that the Defendants*

*informed the Plaintiff of the "Revoke Order" by way of the Certified Mail Signature Return Receipt, the Plaintiff is requesting that the Defendants provide her ALL Mailings, including but not limited to proof of certified mail signature return receipt mailing, that they sent her since 2012.*

2A. Provide Inspection Report of ALL Pennsylvania pharmacies in 2012 – the Questions on the checklist is what the Plaintiff is interested in.

2B. How many times are inspectors asked to wait for the pharmacist in charge or owner to arrive for inspection?

2C. How often do Inspectors return at a later date when requested for an inspection?

2D. How often do Inspectors insist on meeting in restaurants, and not in the pharmacies?

2E. ALL disciplinary actions or complaints against Inspector Bat.

3. Provide ALL of Inspector Bat's handwritten and final interview notes of the Plaintiff and ALL individuals involved in Riccio's pharmacies.

4. Please provide ALL communications between all the Defendants and Federal Prosecutors regarding any of the "Riccio's pharmacies", the Plaintiff, the Indictment cited in the consent order, and any or all allegations about the Plaintiff.

5. Please provide ALL communication between the Defendants and the DEA and/or its agents regarding the Plaintiff, Riccio and Riccio's pharmacies, any and all employees of those pharmacies, the indictments or the allegations made in them.

6. Please provide ALL communications between the Defendants and Peter Riccio or his representatives, including his son Carl Riccio, Sandra Arnao, Pamela Mandel, Laura Hishmeh, Matthew Mandel.

7. Please provide all communications before or after Inspector Bat's inspections of Riccio's pharmacies, between any and all of the defendant's and any employees of Riccio's pharmacies, including those of employees who were not currently employed at those pharmacies at the time of his inspections and those who were employed there at the time of his inspections.

8. Provide ALL disciplinary actions or corrective action history of Peter J. Riccio, Daniel Geiger, Steven Goloff, Albert Buck, David Allen, and James Barnes.

9. Please provide documentation of any all disciplinary actions against any and all of the employees of Riccio's pharmacies, including but not limited to, pharmacists *Steven Goloff, Daniel Geiger*, for either when they were

employed in those pharmacies, before, during, or after their employment with Riccio's pharmacies.

10. Please provide all disciplinary actions taken against Inspector Bat, and complaints made about his conduct by other pharmacies or pharmacists, and any arrest records for Inspector Bat.

11. Please provide all documentation of any kind with regard to communications between Steven J. Goloff and the Defendants or any representative of the Board of Pharmacy. Especially important are communications regarding his pharmacist license.

12. Please provide all documentation of any kind with regard Steven J. Goloff that the Defendants or any representative of the Board of Pharmacy have. Especially important are communications regarding his pharmacist license, misconduct of any kind he may have been accused of or engaged in, any potential actions against his license or any actual actions against his license or any deferment of any kind with regard to actions or potential actions against his license, specifically with regard to his dispensing of Oxycodone, Fioricet, Butalbital, Tramadol, Carisoprodol, Opium, Adderall, and any other drug. Also specifically with regard to any accusations of drugs he may have stolen.

This request for Production is continuing.

## INTERROGATORIES

The Plaintiff is also requesting the Court to order the Defendants to answer the interrogatories (See Exhibit A) which they have not yet done. .

This request for Production and interrogatories is continuing. Especially with regard to Inspector Bat, and with regard to Steven Goloff, the answers provided may compel other questions that must be asked of him.

## CONCLUSION

For the aforementioned, as explained in Exhibit A and demonstrated in Exhibit B and C, the Plaintiff is Requesting the Court to order the Defendants to Provide the Plaintiff with the Requested Documents which are clearly relevant in connection with the above-referenced matter.

Respectfully submitted,                          January 13, 2020

Lenalasher

Lena Lasher, Pro-se, 16 Patton Street, High Bridge, NJ 08829

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Lena Lasher, Plaintiff                         Civil Action No. 17 CV 6388 (LTS)(BCM)

v.

Board Chairperson Theresa M. Talbott, "individually and in his official capacity", et al DEFENDANTS

CERTIFICATE of SERVICE

The Plaintiff, Lena Lasher, hereby certifies that she has this 13th day of January 2020 caused a

copy of the foregoing "Plaintiff's notification to the Court of the Remaining Discovery Issues to Comply with

the Court December 16, 2019 Order" upon the persons and in the manner indicated below which service

satisfies the requirements of PA. R.A.P. 121:

Service by first-class mail, postage prepaid, addressed as follows:

United States District Court                    Attorney General Josh Shapiro, DAG Alison Deibert
for the Middle District of Pennsylvania            Commonwealth of Pennsylvania
Clerk of the Court                                 15th Floor Strawberry Square
PO Box 983, 228 Walnut                             Harrisburg, PA 17120
Harrisburg, PA 17108

Respectfully submitted,                         Date: January 13, 2020

Lena Lasher, Pro-se Plaintiff, 16 Patton Street, High Bridge, New Jersey, 08829

EXHIBIT A – Reasons why the Production of documents are relevant in connection with

Civil Action No. 17 CV 6388 (LTS)(BCM)

Pursuant to Federal Rules of Civil Procedure 33 and 34, the Plaintiff hereby request the Defendants to produce the documents described herein, in accordance with the provisions of Federal Rules of Civil Procedure 26 and 34 and the enclosed instructions.

## INTRODUCTION

*The PA Board of Pharmacy is admitting that they struck a deal with pharmacist Steven Goloff where if he threw me, the Plaintiff, under the bus, he gets to keep his licenses; the government obviously is allowing Goloff a free pass for his own actions if he can shift blame to me. He keeps the license after setting me up as his patsy to suffer the consequences..*

*The government is admitting that Goloff committed acts that should cost him his license; instead of acting on those, they struck a deal. The government don't want to tell us what their deal was or who all was party to it, but the deal is self evidence: the government lied at my trial, attributing to me acts and statements they observed and received from Goloff.*

*That the govt struck deal with Goloff already invalidates their actions against me. It is self evidence that the Defendant inspector Bat lied on the stand against me; he testified against me but did not inspect me, he inspected Goloff.*

*The govt struck deal with Goloff and they lied about me at the trial, misrepresenting their inspection of Goloff by pretending I was present at the inspection. They conspired with Goloff against me so that he could keep his license and I would be convicted. If anything, the govt should want to reveal their papers and their dealings with Goloff because the full truth of their dealings can't look any worse than it already does.*

*Defendant Inspector Bat lied on stand to convict me and protect Goloff because they struck deal with him; yet inspection was of him, not of me.*

## DOCUMENTS requested

1. Provide Proof that the Defendants informed the Plaintiff of the "Revoke Order" by way of the Certified Mail Signature Return Receipt. *Because the Defendants cannot provide the Plaintiff's Proof that the Defendants informed the Plaintiff of the "Revoke Order" by way of the Certified Mail Signature Return Receipt, the Plaintiff*

*is requesting that the Defendants provide her ALL Mailings, including but not limited to proof of certified mail signature return receipt mailing, that they sent her since 2012.*

2A. Provide Inspection Report of ALL Pennsylvania pharmacies in 2012 – the Questions on the checklist is what the Plaintiff is interested in.

*The Plaintiff's request is relevant to her claim and defense in this matter because it would show that the PA BOP discriminated against her because she asserts the inspection was not consistency and uniformity to inspections of other PA pharmacies". The Plaintiff is also asserting that the Hellertown Pharmacy inspection was not consistent with inspections of other PA pharmacies and deviated from accepted inspection procedures. Further, you can not inspect someone who is not present and you can not assume anything said during an inspection reflects on anything other that the speaker. The inspector and the PA Board extrapolated from their inspection things about the Plaintiff that can not be discerned from the inspection. They turned an inspection of Goloff into a set of biased presumptions of the plaintiff who was not inspected and was not present.*

*The PA BOP's inspection must be consistent to all PA pharmacies to prevent discrimination, bias, and prejudicial. If the PA BOP did not discriminate against the Plaintiff, then the inspection report would show the uniformity of ALL PA inspection reports; uniformity is to deter bias, prejudicism, and racism.*

*The PA BOP's revocation of the Plaintiff's pharmacist license had EVERYTHING to do with the inspection of the pharmacy due to Defendant Inspector Bat's FALSE testimonies against her in regard to his inspection of the pharmacies, which was backed up with no evidence because he NEVER inspected her, yet he testified against her, to attain the wrongful conviction.*

*Defendants "OBJECT to the request as it is overly broad and burdensome. There are approximately 17671 pharmacies that require inspection in Pennsylvania." However, the Defendants failed to state that only a handful of PA pharmacies were inspected yearly. The Defendants are trying to pull the wool over the court's eyes, because the number of pharmacies in PA has very little to do with the only relevant number here: the handful of pharmacies the board actually inspects.*

*Defendants' argument that "producing inspection records for all of these pharmacies for even a one year period is clearly overly burdensome to Defendants," relies on the deception that they inspect a staggering number of pharmacies when they in fact do not. It is also laughable and worthy of mockery to say that they*

*should be excused from doing the work because it is too much work. Did they think discriminating against the Plaintiff and shifting blame from the person they inspected and to the Plaintiff should be easy?  Did these Law school graduates think they no longer had to do any work once they got the degree or passed the bar? Do they need the taxpayers to hire day laborers who stand out in front of Home Depot in search of an honest days work that the Defendants themselves are unwilling to do?*

*The Defendants OBJECT to the request as it seeks confidential and privileged information pursuant to PA statute* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉*. However,*

*1.  The PA Board of Pharmacy is admitting that they struck a deal with pharmacist Steven Goloff where if he threw me, the Plaintiff, under the bus, he gets to keep his licenses; the government obviously is allowing Goloff a free pass for his own actions if he can shift blame to me. He keeps the license after setting me up as his patsy to suffer the consequences.*

*The government is admitting that Goloff committed acts that should cost him his license; instead of acting on those, they struck a deal. The government don't want to tell us what their deal was or who all was party to it, but the deal is self evidence: the government lied at my trial, attributing to me acts and statements they observed and received from Goloff.*

*That the govt struck deal with Goloff already invalidates their actions against me. It is self evidence that the Defendant inspector Bat lied on the stand against me; he testified against me but did not inspect me, he inspected Goloff*

*The govt struck deal with Goloff and they lied about me at the trial, misrepresenting their inspection of Goloff by pretending I was present at the inspection. They conspired with Goloff against me so that  he could keep his license and I would be convicted. If anything, the govt should want to reveal their papers and their dealings with Goloff because the full truth of their dealings can't look any worse than  it already does.*

*Defendant Inspector Bat lied on stand to convict me and protect Goloff because they struck deal with him; yet inspection was of him, not of me.*

*2. If the Defendants are trying to claim that providing this information is some kind of HIPAA violation it just goes to show that they have no understanding of the laws that are applicable here this should disqualify*

*them from working on this matter altogether. HIPAA protects patients rights. The Pharmacies in Pennsylvania are not sick and have not gone to see a doctor so I don't see how there this could be a HIPAA violation; it is a violation of the Plaintiff's due process rights and that's why these materials are needed because the state of Pennsylvania is choosing to apply one standard to the Plaintiff a standard that is not found in the law and is another standard that they have applied to all the other pharmacists, including but not limited to Steven Goloff, in Pennsylvania in that it was GOLOFF that the Inspector inspected.*

*The Point is that by looking at all the other inspection reports it will become clear that the state does not hold one person responsible for another failure.*

*The requested information is wholly RELEVANT to the current matter.*

*The Plaintiff is asserting that the voluntary surrender of the Plaintiff's NJ pharmacist license is irrelevant in this case. This case is about the Defendants holding a hearing to revoke the Plaintiff's license in her absence and without her knowledge.*

2B. How many times are inspectors asked to wait for the pharmacist in charge or owner to arrive for inspection?

*This request is absolutely relevant to the Plaintiff's claim and defense in this matter. The Plaintiff's revocation had EVERYTHING to do with the inspection of the pharmacy because of Inspector's Bat false testimony, The PA BOP's revocation of the Plaintiff's pharmacist license had EVERYTHING to do with the inspection of the pharmacy due to Defendant Inspector Bat's FALSE testimonies against her in regard to his inspection of the pharmacies, which was backed up with no evidence because he NEVER inspected her, yet he testified against her, to attain the wrongful conviction. Therefore, the requested information is wholly RELEVANT to the current matter.*

*The Plaintiff requested that Inspector Bat waited for her to get to the pharmacy due to her hearing Goloff feeding Inspector's lies over the phone that the pharmacies did not have "such records", when they clearly did. It was obvious that Goloff was hiding records from Inspector Bat, and Inspector Bat allowed such.*

2C. How often do Inspectors return at a later date when requested for an inspection?

*Same answer as in 2A and 2B. Therefore, the requested information is wholly RELEVANT to the current matter.*

2D. How often do Inspectors insist on meeting in restaurants, and not in the pharmacies?

*Same answer as in 2A and 2B. Therefore, the requested information is wholly RELEVANT to the current matter.*

2E. ALL disciplinary actions or complaints against Inspector Bat.

*Same answer as in 2A and 2B. Therefore, the requested information is wholly RELEVANT to the current matter.*

*Although Inspector Bat did not testify at Plaintiff's license revocation, but because the revocation was due to his false testimony at the Plaintiff's trial. There was no reason for him to testify against the Plaintiff as he NEVER inspected her. It was GOLOFF whom he inspected, yet he testified against her to attain the wrongful conviction. Therefore, the requested information is wholly RELEVANT to the current matter.*

3. Provide ALL of Inspector Bat's handwritten and final interview notes of the Plaintiff and ALL individuals involved in Riccio's pharmacies.

*Although Inspector Bat did not testify at Plaintiff's license revocation, but because the revocation was due to his false testimony at the Plaintiff's trial. There was no reason for him to testify against the Plaintiff as he NEVER inspected her. It was GOLOFF whom he inspected, yet he testified against her to attain the wrongful conviction. Therefore, the requested information is wholly RELEVANT to the current matter.*

4. Please provide ALL communications between all the Defendants and Federal Prosecutors regarding any of the "Riccio's pharmacies", the Plaintiff, the Indictment cited in the consent order, and any or all allegations about the Plaintiff.

*Because Defendants based the revocation on the wrongful conviction attained by the Federal Prosecutors, the requested information is wholly RELEVANT to the current matter.*

*At trial, Goloff disclosed negotiations made between him and the PA BOP that in exchange for his testimony against the Plaintiff, the PA BOP would not go after his license, thus a violation of the Plaintiff's due process, equal protection clause, and the governing pharmacy law. Therefore, this negotiation between Goloff and PA BOP must be turned over to the Plaintiff; the requested information is wholly RELEVANT to the current matter.*

5. Please provide ALL communication between the Defendants and the DEA and/or its agents regarding the Plaintiff, Riccio and Riccio's pharmacies, any and all employees of those pharmacies, the indictments or the

allegations made in them.

*Although Inspector Bat, Goloff, Geiger, and the DEA did not testify at Plaintiff's license revocation, but because the revocation was due to their false testimony at the Plaintiff's trial to attain the wrongful conviction; the Defendants used this conviction to attain the revocation, therefore, the requested information is wholly RELEVANT to the current matter.*

6. Please provide ALL communications between the Defendants and Peter Riccio or his representatives, including his son Carl Riccio, Sandra Arnao, Pamela Mandel, Laura Hishmeh, Matthew Mandel.

*Although Defendants and the aforementioned did not testify at Plaintiff's license revocation, but because the revocation was due to their false testimony at the Plaintiff's trial to attain the wrongful conviction; the Defendants used this conviction to attain the revocation, therefore, the requested information is wholly RELEVANT to the current matter.*

7. Please provide all communications before or after Inspector Bat's inspections of Riccio's pharmacies, between any and all of the defendant's and any employees of Riccio's pharmacies, including those of employees who were not currently employed at those pharmacies at the time of his inspections and those who were employed there at the time of his inspections.

*Although Defendant Bat and the aforementioned did not testify at Plaintiff's license revocation, but because the revocation was due to their false testimony at the Plaintiff's trial to attain the wrongful conviction; the Defendants used this conviction to attain the revocation, therefore, the requested information is wholly RELEVANT to the current matter.*

8. Provide ALL disciplinary actions or corrective action history of Peter J. Riccio, Daniel Geiger, Steven Goloff, Albert Buck, David Allen, and James Barnes.

*Although Defendants and the aforementioned did not testify at Plaintiff's license revocation, but because the revocation was due to their false testimony at the Plaintiff's trial to attain the wrongful conviction; the Defendants used this conviction to attain the revocation, therefore, the requested information is wholly RELEVANT to the current matter.*

*Further, the Defendants admitted to committing the misdeeds and violating pharmacy law and regulations which the government accused the Plaintiff of, yet nothing happened to their licenses.*

*Same as 2a*

9. Please provide documentation of any all disciplinary actions against any and all of the employees of Riccio's pharmacies, including but not limited to, pharmacists *Steven Goloff, Daniel Geiger*, for either when they were employed in those pharmacies, before, during, or after their employment with Riccio's pharmacies.

*Disciplinary actions undoubtedly have bearing in this case because the Plaintiff's license was revoked while others who admitted to violating pharmacy rules and regulations weren't, a violation of the plaintiff equal protection right. Therefore, the requested information is wholly RELEVANT to the current matter.*

*Same as 2a confidential*

*overly broad*

10. Please provide all disciplinary actions taken against Inspector Bat, and complaints made about his conduct by other pharmacies or pharmacists, and any arrest records for Inspector Bat.

**Although Defendant Bat did not testify at Plaintiff's license revocation, but because the revocation was due to their false testimony at the Plaintiff's trial to attain the wrongful conviction; the Defendants used this conviction to attain the revocation, therefore, the requested information is wholly RELEVANT to the current matter.**

**Defendants claimed they are not the repository for arrest records; this contradict their claim because the Defendants definitely have the Plaintiff's arrest records, as per evidence they submitted to the Plaintiff.**

11. Please provide all documentation of any kind with regard to communications between Steven J. Goloff and the Defendants or any representative of the Board of Pharmacy. Especially important are communications regarding his pharmacist license.

**Although Defendant Goloff did not testify at Plaintiff's license revocation, but because the revocation was due to their false testimony at the Plaintiff's trial to attain the wrongful conviction; the Defendants used this conviction to attain the revocation, therefore, the requested information is wholly RELEVANT to the current matter.**

**Further Defendant Goloff admitted to committing the "acts" the Government accused the Plaintiff did, nothing was done to Defendant Goloff, thus violating the Plaintiff equal protection rights.**

 *2a confidential*

12. Please provide all documentation of any kind with regard Steven J. Goloff that the Defendants or any representative of the Board of Pharmacy have. Especially important are communications regarding his pharmacist license, misconduct of any kind he may have been accused of or engaged in, any potential actions against his license or any actual actions against his license or any deferment of any kind with regard to actions or potential actions against his license, specifically with regard to his dispensing of Oxycodone, Fioricet, Butalbital, Tramadol, Carisoprodol, Opium, Adderall, and any other drug. Also specifically with regard to any accusations of drugs he may have stolen.

*Although Defendant Goloff did not testify at Plaintiff's license revocation, but because the revocation was due to their false testimony at the Plaintiff's trial to attain the wrongful conviction; the Defendants used this conviction to attain the revocation, therefore, the requested information is wholly RELEVANT to the current matter.*

*Further Defendant Goloff admitted to committing the "acts" the Government accused the Plaintiff did, nothing was done to Defendant Goloff, thus violating the Plaintiff equal protection rights.*

*At trial, Goloff disclosed negotiations made between him and the PA BOP that in exchange for his testimony against the Plaintiff, the PA BOP would not go after his license for the "illegal" dispensing of oxycodone, thus a violation of the Plaintiff's due process, equal protection clause, and the governing pharmacy law. Therefore, this negotiation between Goloff and PA BOP must be turned over to the Plaintiff; the requested information is wholly RELEVANT to the current matter.*

 *2a confidential*

This request for Production is continuing.

INTERROGATORIES

1. In regard to Inspector Bat:

A. Explain why Inspector Bat's testimony contradicts the physical evidence, including the pharmacies' paper trails and his own inspection reports?

B. Why did Inspector Bat refuse to meet with the Plaintiff and the Pharmacies' owner who were both on their way to meet him, both at the first inspection and the second?

He took off the moment he found out the Plaintiff and the owner were on their way to meet him at both

pharmacies.

When he was in Hellertown, he was informed the Plaintiff and the owner were coming to see him at Hellertown where they could address any concerns he had and correct any misstatements made by Goloff. Rather than waiting for the Plaintiff and the owner, he left to inspect Riccio's pharmacy in Palmer. When he found out the Plaintiff and the owner were on the way to Palmer, he took off again even though we arrived as we said we would within a few minutes. It was five minutes from our asking him to wait and our arrival. It was still early afternoon. Why didn't he wait?

C. Why did Inspector Bat REFUSE to meet/interview the Plaintiff in the pharmacies but instead insisted on meeting her at a restaurant?

D. Why did Inspector Bat lie at trial, stating he wouldn't talk to Riccio, stating that Riccio was not a licensee?

E. The Plaintiff informed Inspector Bat of the counting machine at the interview, why didn't Inspector Bat asked to see the counting machine if he did not believe her?

F. Why did Inspector Bat not return to pharmacy to reinspect?

G. What direct knowledge of the pharmacies' sick policies did Inspector Bat have? What information about the pharmacies' sick policy did he get through hearsay or word of mouth? Was Inspector Bat testimony at trial referring to the pharmacies' sick policies in effect at the time of his inspection? Any and all explanations about Inspector Bat's expertise on the pharmacies' sick policies and their evolution over time, and how he gained this expertise or knowledge is being asked for here. Is it within the role of a Board of Pharmacy inspector to inspect a store's sick policy? If so, is it within the role of a Board of Pharmacy inspector to inspect a store policy on sick days from months before the date of his inspection instead of the one in effect as he is making his inspection?

2. What did the Federal Prosecutors claim to the Defendant's or their representatives about the Plaintiff?

3. Did the Federal Prosecutors communicate with the Defendant's concerning any other employee of Riccio's Pharmacies? If so what was communicated?

4. What communications occurred between Steven Goloff and the Defendant's or their representatives?

This request for Production and interrogatories is continuing. Especially with regard to Inspector Bat, and with regard to Steven Goloff, the answers provided may compel other questions that must be asked of him.

CONCLUSION

Please provide the Plaintiff with the Requested Documents and Answer her **AMENDED Request** *(in italic)* to her First Request for Production of Documents and First Set of Interrogatories Directed to Defendants

Respectfully submitted,                    January 13, 2020

*Lena Lasher*

Lena Lasher, Pro-se, 16 Patton Street, High Bridge, NJ 08829

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Lena Lasher, Plaintiff                          Civil Action No. 17 CV 6388 (LTS)(BCM)

v.

Board Chairperson Theresa M. Talbott, "individually and in his official capacity", et al DEFENDANTS

Dear Attorney Deibert,

I am in receipt of your response to my discovery request, which you still unconstitutionally objected to because the discovery (See Exh A - Plaintiff's **AMENDED Request** *(in italic)* to her First Request for Production of Documents and First Set of Interrogatories Directed to Defendants) **would aid in my defense and prove that the Pennsylvania Board of Pharmacy DID discriminated against me which is made obvious by the way the Board dealt with Pharmacist Steven Goloff**. You also denied my request by lying to the Court that my request was not included in my original request when it was (See page 4 item 7 and 9 of your October 1, 2019 letter to Plaintiff). Before I make myself clear to the Court on why my request for discovery is pertinent for this case, please allow me to respond to the irrelevant "new documents" you sent me and to the Court; the "new documents" you sent is your best attempt to confuse the Court and at worst wholly deceptive. The "new documents" will actually show to the Court why this current lawsuit has merit and that my assertions is nothing but the truth and backed up with the LAW. You sent:

1. Defendant Exhibit B – a "Narcotics Conspiracy" Indictment of November 20, 2012. However, this indictment was DROPPED and therefore irrelevant and there were no reason for you to bring up an indictment that was DROPPED. But because you sent this indictment to prejudice me, and that is all, to prejudice me, please allow me to explain why this indictment is flawed and defective overall.

In November of 2012 I was arrested along with nine others as an alleged co-conspirator where I was accused of violating the Controlled Substances Act for dispensing Tramadol and, allegedly, Butalbital. Eight of the so-called co-conspirators pled guilty, but I refused to because I knew I was not guilty and that none of the alleged co-conspirators were. My resistance forced the prosecutors and the judge to either admit they were wrong or to misrepresent the law in order to justify the charges and the plead deals. They chose the latter. But, I knew I was innocent for two simple reasons. The first reason I knew I was innocent was that Tramadol was not a

controlled substance in 2012 and it only became one 21 months after the arrests, which was long after the court accepted plea deals for an act that did not violate the law. When confronted with this fact in a motion to dismiss the charges, Federal District Court **Judge Naomi Reice Buchwald** was obviously caught off-guard, because she responded to the simple fact of the matter in two incoherent ways: 1) she claimed that a Motion to Dismiss the charges was not the time to address the fact that the allegation did not break the law; and 2) she claimed the charge in the indictment was not a charge but instead it was simply background information, in spite of the fact that there was nothing about the wording around Tramadol that was any different than "Butalbital" which was the only other drug named in the indictment. The second reason I knew I was not guilty was because I have never dispensed Butalbital in my entire career and had never worked in a pharmacy that stocked it and have never ever seen a prescription for Butalbital. The drug simply never existed in the pharmacies, and it is exceptionally unlikely to the point of a near impossibility as one can get that or the alleged co-conspirators committed any act with that drug. Butalbital is an antiquated drug used to treat insomnia that is no longer prescribed because there are safer drugs for that task. Today it is used in manufacturing other drugs and I doubt any pharmacy, retail or hospital, in the country stocks it with the possible exception of compounding pharmacies. If the BOP were competent they would not present that indictment as if it said anything bad about me because they would know simply by reading the allegations that there is something very lacking in the allegations themselves: Tramadol was not a controlled substance and no pharmacy has Butalbital.

The Indictment is also flawed in that the dispensing of "highly addictive pain meds" is a term that does not exist in law nor in the health care industries and used only to deceive the jury by creating standards that do not exist under the law, which both the District and Appellate Court failed to mention ONE name of the "highly addictive pain meds" that was dispensed, because there were NONE. In fact, the Plaintiff has filed motion(s) requesting the District AND Circuit Courts for an EVIDENTIARY HEARING:

1). for an inventory and bill of laden of all butalbital tablets that allegedly existed in the three Riccio's pharmacies, based on the filing of the Plaintiff's 2255 Motion.

2) name ONE "addictive pain med" that was dispensed by the Plaintiff; and to date, both the District AND Circuit Courts failed to name one "addictive pain med". Instead, the District Court denied "each of the supplementary motions" (Page 2 of 8/20/18 Memorandum and Order") by NOT answering them, because the

Plaintiff NEVER dispensed One "butalbital tablet" nor an "addictive pain med" NOR a "pain med" via the "internet" (This will be further discussed in Argument I item #2 in Exhibit C – Motion for a Certificate of Appealability, which is still pending in the Second Circuit)  If trial and appellate counsels had done their due diligence, they would know that the aforementioned statement was flawed and is NOT found in the law.

The Defendants falsely accused me of being in charged of BOTH pharmacies as well as an owner of the pharmacies (See Attorney Deibert's October 1, 2019 letter to the Plaintiff page 3 item 2A and page 4 item 10) Hellertown Pharmacy and Palmer Pharmacy & Much More; the Pennsylvania Board of Pharmacy, if they were competent, knew this more than anyone because Steven Goloff was on record as the pharmacist in charge of Palmer Pharmacy & Much More,  and Goloff's shifting of blame to the Plaintiff is also against the governing pa pharmacy law (PA 27.12(b)(2).  At no time, was the Plaintiff's the supervisor of Goloff – he does NOT listen to the Plaintiff whereas the Plaintiff plead with pharmacist Goloff to **FOLLOW the LAW**   see Exh E - "Quality Control Each tote of drugs that is filled, please initial the name of the tech/pharmacist who filled the tote and your initial as pharmacist who checked the count. Also, date the tote with the date you checked the tote. You will be held accountable for the COUNT", "Steven (Goloff) you NEED to supervise the techs' count!!! Too many mistakes!...")

The governing law (PA 27.12(b)(2) and the criminal statute 21 U.S.C. Sec. 321 (g)(1), 352(a), 352(c), 353(b)(1), 353(b)(4)(A), 21 U.S.C. Sec. 331(a) and 333 (a)(2) REQUIRE the accused to be present at the pharmacy at the time the specific prescriptions in question were filled. Also, the governing pharmacy law protects a pharmacist from being held liable for another's actions. Numerous pharmaceutical law and protocol support the Plaintiff's testimony while impeaching the testimony of Prosecution witnesses and one of the main contentions of the prosecution's case. The lack of ability to present that critical video evidence, while the government asserted the knowledge of it's existence further undermined the truth and advanced the perjured testimony. See Demarco v United States 928 F.2d 1074 (11th cir. 1991). The failure for the prosecution to correct perjured testimony is ground for a fair hearing.

The Prosecution and their witnesses also claim the Plaintiff was in New Jersey: remotely monitoring, supervising, and directing employees in the PA stores to commit the crimes. The Prosecutors specifically stated that the video evidence showed the Plaintiff remotely monitoring and remotely directing workers in

Pennsylvania pharmacies to commit the alleged acts. But the Prosecution never presented that video evidence. They instead suppressed it and the Judge withheld it. Unsurprisingly, the **video shows the Plaintiff busily working in a New Jersey Pharmacy on all of the dates in question, not remotely monitoring or supervising employees in the other stores, as the prosecution claimed**. The prosecution and its witnesses claimed the Plaintiff did not count pills, reused medications, improperly labeled and stored medications. However, the **admittance of vastly superior video evidence will show that the Plaintiff follows rules and regulations of pharmacy law, properly handling pills and prescriptions, labeling and storing and destroying medications properly, and dispensing medications with valid prescriptions which were verified by doctors, all contradicting the prosecutors' witnesses sworn testimony**. The video recordings will further prove **the drug "butalbital" NEVER existed in the pharmacies**.

The 2012 Indictment was dismissed AFTER the Court took plea deals from other defendants. This 2012 Indictment was another chance to distract the Court. My conviction was a sham. It is easy to see in the law that "Butalbital" is not Fioricet. The Government lied to the Court; their action was prejudicial in that they:

(1) cut a deal with pharmacist Goloff to testify against me,

(2) aid the Defendant Inspector Thomas Bat to lie.

(3) The representative of the state agency, Defendant Inspector Thomas Bat, showed up at my trial to give credence to Goloff's testimony and he did that by lying.

Every single statement of the 2012 Indictment (and the Superseding Indictment) can be refuted in Exhibit C – Motion for a Certificate of Appealability.

2. Defendant Exhibit C - Southern District Court Reporters – it is Unsurprisingly how Attorney Deibert did NOT put Dr. Konakanchi's perjured testimonies into the exhibit, because the Plaintiff can ALSO refute each and everyone of her false testimonies (See Exh C pages 16, 85-86, 94, 102-103, 121-122, 125), which is pending in the NJ Middlesex Superior Court.

A. Burling's perjured testimonies can be backed up with physical evidence (See Exhibit C page 85 and Exhibit F phone records and 3500 material of Dr. Burling)

Dr. Konakanchi and Dr. Burling perjure themselves by telling the jurors that they never spoke to the Plaintiff or any pharmacists. However, Doctors' faxes of Dr. Konakanchi stated that the doctors themselves

phone consulted patients. Further, tech Katie Scott and Erik Cajilema told the agents that they/pharmacists spoke to doctors, including Dr. Burling, to confirm that he phone consulted patients; this testimony along with phone and fax records contradict Dr. Burling, the government witness' false testimony.

To reiterate, their testimonies contradict pharmacy business records; withholding this evidence is a violation of the best evidence rule; Dr. Konakanchi's faxes(Exh G) informed the pharmacy that she phone consulted each patient; whereby, this would have shown the jury that the Plaintiff was truthful. As in US v. Walter, 2017 BL 303067, 7th Cir., 16-1325 Nos. 16-1209, 8/29/17, Government should have revealed that its witness lied. Quoting Chief Judge Diane P. Wood, the witness's "testimony was important because of its detailed, firsthand nature, and because it corroborated what the other witnesses were saying" about the defendants' involvement in the conspiracy. Dr. Konakanchi and Dr. Burling's motivation was to secure lenient treatment in exchange for implicating the Plaintiff.

B.  Pharmacist Steven Goloff's perjured testimonies can be backed up with physical evidence

The District Court is known for protecting perjured testimonies from witnesses she called "honest" (8/20/18 Memorandum and Order page 5), even though witness Steven Goloff admitted to stealing Narcotics OXYCODONE not once or twice BUT a few times (Defendant Exhibit C pages 849 - 853, was caught for soliciting PROSTITUTES, framed Dr. Haytmanek of untrue allegations as detailed below, and whose self-confessed alleged crimes the Plaintiff was held responsible for in spite of the fact that no law holds one pharmacist responsible for another's actions, and in fact the law specifically holds all pharmacists responsible for their own actions.

Goloff lied because he was written up for violating pharmacy law PRIOR to the PA BOP's inspection. Goloff resented the Plaintiff for holding him accountable for being a bad pharmacist.  Unfortunately, the District Court withheld the unredacted evidence (See Exh E ).  To emphasize, Goloff has a history of lying to officials about other health care professionals, including but not limited to Dr. Haytmanek. Inspector Bat, instead of "inspecting" took an easy paycheck by relying on hearsay testimony.

1.      Newly discovered evidence, Pennsylvania Board of Medicine Hearing transcripts, directly contradict allegations about forged and misbranded prescriptions and more alleged dispensing to alleged addicts. This evidence shows that the Prosecutors, their Witnesses, and even the Judge perjured themselves with regard to

Opium Tincture prescriptions, thus this represents a denial of the Plaintiff's constitutional right to a fair trial.

Pennsylvania Board of Medicine transcripts, docket # 0335-49-B file no. 12-49-11424, (See Exh H) is new exculpatory evidence that should be admitted into evidence because it directly contradicts the Prosecution's version of events in an incident that they spent most of their time at trial on: Opium Tincture prescriptions prescribed by Dr. Cochran for his patient Dr. Haytmanck. When read side by side with the trial transcripts, they show the prosecution and their witnesses and even the judge perjured themselves.

a.  Much of the trial focused on opium tincture prescriptions for Dr. Haytmanek written by Dr. Cochran (See Exh I). Dr. Haytmanek is a patient suffering from chronic diarrhea and the opium tincture is an appropriate medication indicated for that ailment.  Prosecution's witnesses Steven Goloff actually filled 17 of the 20 of these prescriptions.  At some point, **Steven Goloff decided to frame Dr. Haytmanek** by reporting him to the Pennsylvania Board of Medicine for being a "drug addict" who obtains his drugs illegally.  At the Plaintiff's trial, the prosecution and 5 of their witnesses, Pharmacy Inspector THOMAS BAT (a Pennsylvania State Board executive official), pharmacists Steven Goloff (Defendant Exhibit C   Page 832) and Daniel Geiger, technicians Albert Buck and James Barnes, framed the Plaintiff by falsely accusing her of forging these prescriptions (Dr. Cochran's) and illegally dispensing to Dr. Haytmanek whom they called "an addict".  However, in the form of a DIRECT testimony from Dr. Cochran in an interview by DEA Agent Murphy, which was withheld from the jury (See Exh I - Bates document 010085, T. 1939-1942) by the trial Judge, which should be considered best evidence and far superior to testimony from their witnesses, stated that he wrote and signed those prescriptions himself. (See Exh I). Hence, these perjuries were made more effective by the District Court's decision to withhold the physical evidence that showed these lies for what they are (T.832)  Further, the Trial Judge, presuming the role of a handwriting analysis expert witness from the bench, flatly accused the Plaintiff of forging Dr. Cochran's prescriptions.

Even worse, AUSA Richenthal and Greenberg in their **summation** reiterated this false accusation of forgery telling the jury the Plaintiff forged Dr. Cochran's prescriptions.  During AUSA Greenberg's summation (T. 1815), she falsely told the jurors the Plaintiff forged Doctor Cochran's signatures on prescriptions:

> Greenberg:...Just take a look at them lined up. They all look the same. They have all got the same handwriting, the same pen, same signature. These prescriptions are clearly forged... You have seen that handwriting before. That's Ms. Lasher's handwriting... You have seen this handwriting before. This is

Ms. Lasher's handwriting.

More damagingly, the story they made up about these prescriptions were disproved at a hearing before the Pennsylvania Board of Medicine on October 8th, 2013, 19 months prior to the Plaintiff's trial (See Exh H - docket # 0335-49-B file no. 12-49-11424 Pg. 28), that there was nothing wrong with with any aspect regarding Dr. Haytmanek's prescriptions, but the Prosecution and its witnesses insisted on putting on a show slandering her and the doctor. This newly discovered evidence from the Board of Medicine's hearing not only contradict the Prosecution's version of these events, built entirely on testimony and conjecture, but they support a piece of physical evidence that was withheld from the Jury.

Dr. Haytmanek was exonerated of any wrong doing and shown to not be a "drug addict" by the Pennsylvania Board of Medicine. If the Government's version events were true, the following would have had to happen:

A. Dr. Cochran's prescriptions pads would have to have been stolen,
B. The prescription pads would have to have ended up in the Plaintiff's possession.
C. Dr. Cochran would have to have failed to report these stolen controlled substances prescription pads,
D. Dr. Cochran would have to have been arrested for not reporting the stolen pads,
E. Goloff would have to have been arrested for dispensing 17 of these allegedly forged prescriptions,
F. Prosecutors would have real crimes to charge the Plaintiff instead of the nonsense that went on at her trial.

That none of this happened would seem to indicate that everyone on the Prosecution team knew it was all lies meant to slander the Plaintiff and deceive the jury

The failure for prosecution to correct perjured testimony is grounds for a fair hearing. Demarco v. U.S.928 F. 2d. 1072 (11th cir. 1991)Duc process bars a prosecutor from making, knowingly use of false statements. Also, see Giglio v. US 405 U.S. 150, (1972); Napue, 360 U.S. at 271, U.S. v. Lowery, 135 F.3d. 957 (5th cir 1998), U.S. V. Booth, 994 F 2d. 63 (2cd cir 1993).

Most notably, the Plaintiff was never indicted for any of the above mentioned acts, and they are serious criminal allegations, allegations the prosecutors and the judge knew were untrue. If the Plaintiff violated the law, the Government would have used against her the video recordings, most of which are still suppressed, from the pharmacy where Dr. Haytmanek got his prescriptions-- prescriptions we now can prove via two ways were completely legitimate: the withheld Bates Document, and the newly discovered transcripts where these prescriptions were at issue. If the government were not still suppressing 9 of the 10 video recordings, which the Plaintiff contends are still suppressed because the government knows that she did not break any law, we would

have 3 ways that disprove the allegations which dominated the trial in terms of total testimony and number of witnesses testifying and actually perjuring themselves. This exculpatory evidence would have exonerated her and is a clear violation of Brady as well as a violation of Plaintiff's 5th Amendment Right (Due Process).  As shown in Exhibit C - **POINT C: Flaw in the jury Instruction** Misbranding of Opium and Oxycodone, ambiguous charges to deny the Plaintiff her constitutional right pgs 64-75 below, the "misbranding" the Plaintiff stands wrongly convicted of may have included these false allegations about Opium Tincture prescriptions, due to ambiguity in the indictment and in the Judge's instructions to the Jury, thus **another unconstitutional denial of the Plaintiff's right**.

**SHOCKINGLY**, the video evidence shows that AUSA Greenberg knowingly misled the jury by referring to testimony she new to be false, that on October 2, 2012, Albert Buck "on two occasions, went to Ms. Lasher and stating something is wrong here; this is unusual. The second time, Buck said they (the oxycodone patients) appear to be high. "stating... Ms. Lasher said, "just fill...we are just filling the prescription. It's fine". James Barnes, Steven Goloff, all said the same thing..."She didn't care." (T.1807-1808).

These are all false statements made to deceive the jury and prejudice them against the Plaintiff.  Since the Plaintiff was **not on duty** at Hellertown Pharmacy on October 2, 2012, but working in another pharmacy in another state, if the Jury were shown this video evidence, they would know they had been lied to by 2 witnesses and the Prosecutors, and they would show that the testimony from Agent Murphy about October 2nd was irrelevant and only presented to trick them into being prejudiced against the Plaintiff. It was Goloff who dispensed all those prescriptions on October 2, 2012.  That District's Judge allowed this testimony is grounds for reversal of the Plaintiff's conviction and sentence.

**UNSHOCKINGLY**, Goloff's dispensing hundreds of Oxycodone prescriptions was "one of the things that he did for which he received nonprosecution treatment from the GOVERNMENT (Defendant Exhibit C page 899); this SHOCKS the conscience.

**INTRODUCTION -  EXPOSING PERJURIES IS SEEKING JUSTICE**

*Although Defendant Bat and pharmacist Goloff did not testified at my hearing, they falsely testified at my trial and thus caused my conviction. The board based my wrongful conviction to revoke my license. Therefore, their testimonies at my trial had everything to do with this hearing. The Board has NO statutory*

*authority nor duty to revoke a license based upon perjured testimonies by their "own" representative.*

**To reiterate, the conviction** is flawed because the Defendants had not only a hand in creating it but that they lied via their representative who testified against me at the trial even though he had no dealings with me and instead had inspected pharmacist Goloff, and they had a hand in creating the conviction by making a deal with Goloff if he helped convict me.

This lawsuit is not to figure out why the Government made a deal with a pharmacist, Steven Goloff, who they admit committed all of these mistakes (See Exh D - this evidence is pertinent to prove that a deal was made between the PA Board of Pharmacy and Goloff). This lawsuit is to point out that they are treating the Plaintiff in a prejudicial matter because by their own admission this licensed pharmacist Goloff who has performed all these misdeeds is KEEPING his license while they took mine; they took mine because Goloff struck a deal with them in order to convict me. Not only did the Defendants make a deal with Goloff to keep his license but they sent their own inspector Bat to lie at my trial to make sure I was convicted and now they pretend that the conviction is all that matters with regard to my license and not their own very heavily placed hand on the supposed scale of justice that manufactured that conviction out of their own lies. Lawyer take an oath to protect the system and the integrity of the law; every time they lie, every time they use such obviously bad reasoning, they make a mockery of that oath and put into question the legitimacy of this system. Anyone who take such arguments and obvious lies seriously does a disservice to our country and our legal system.

It's interesting that the Defendants point out that Steven Goloff and Defendant Inspector Bat were not at the hearing but they have already stated that they made up their mind about revoking my license before the hearing (See Page 2 of Attorney Deibert's October 1, 2019 letter to Plaintiff "the mere fact that you were convicted is sufficient grounds to revoke." The Defendants have already admitted their prejudicial behavior by pointing out that they were going to revoke my license regardless of whether or not I was at the hearing. The Defendants have also shown that they readily lie to the Court whenever they think it will serve their purpose. They have lied about the mailings they've sent and I am providing proof that they lied about their mailings (See exh J – Defendants' previous mailing were to the Plaintiff as well as to her counsel PRIOR to the "hearing". For them NOT to mail anything to the Plaintiff in regard to their revoking the Plaintiff's license in her absence and

without her knowledge is clearly a denial of due process and an attempt to prevent her from requesting for a (FAIR) hearing".

None of the Defendants' arguments should be viewed as anything other than disingenuous. The Defendants are also attempting to pull the wool over the court's eyes by referring to a deal made between Goloff and the federal prosecutors which is a distraction away from their own investigation into his misdeeds; misdeeds that:

1. Goloff admitted on the stand at my trial,

2. Their own investigation which if that is true that Goloff did nothing wrong, then they should not be hiding the investigation from this discovery process (See Exh D) .

The Defendants are also being disingenuous when they claim that my conviction is why they revoke my license while pretending away their own hand in that conviction which was contributed to by their own representative lying on the stand to protect Goloff from the result of his inspection where their own representative shifted responsibility for that inspection onto me at my trial. All of this are obvious examples of prejudicial behavior on the part of the Defendants against me and is unreasonable irrational favoritism showed towards Goloff. Had there been a hearing and had that hearing been fair the Board would have had to have dealt with their own protection of Goloff and his misdeeds, and their own misdeeds with regard to shifting responsibility for Goloff's inspection onto me but the Defendants already admit I was not getting a fair hearing. The hearing was essentially a show trial a ritual meant to create the false appearance of due process in spite of that fact that they have already decided to take my license and they admitted to it. The Defendants lied to the Court; they admitted they were prejudiced against me. They admitted they conducted a hearing without me or my lawyer and they lied about the mailings to deceive the Court and for them not to appear as if they conduct themselves in a righteous manner.

## ARGUMENT

The Plaintiff is NOT here to prove her innocence before the Board, but to have a FAIR hearing as to why her license should be "ACTIVE". In fact, the Defendants revoked the Plaintiff's license by conducting a hearing in her absence and without her knowledge.

The Defendants' shifting this civil action against them by changing the topic to the Plaintiff's conviction

is an attempt to distract the court from their own wrong doing. But because they brought up the Plaintiff's conviction, the Plaintiff has every right to defend herself. In fact, the crimes alleged at trial were not supported by any physical evidence, only testimony. Crimes admitted to at trial by the Prosecution's witnesses, were blamed on the Plaintiff for no other reason than to shift blame. Video evidence was claimed by the prosecution to show a wide range of illegal behavior, including the remote micromanaging of other licensed professionals working in other pharmacies supposedly to ensure they were acting illegally. The Prosecution suppressed that video, tampered with it, and only after extensive struggling, released one of the ten sets of recordings to the Plaintiff (See Exh K). The video shows none of what they claim it shows.

To reiterate, physical exculpatory video recording evidence and the pharmacy paper trail, which were **suppressed and withheld** from the jury showed that

(1). It was the prosecutions witnesses who perjured at the Plaintiff's trial

(2). The Plaintiff did everything according to the law, including:

      (a). Counting, labeling, storing, and destroying medications properly,

      (b). Dispensing medications with valid prescriptions, which were verified by doctors

      (c). TRIPLE checking all of her work. Again, as the video recordings showed, all pills were hand counted and the Plaintiff was Consistent and DILIGENT in her work.

In order to evade responsibility for their prejudicial actions against me, the defendants do not cite any law that prevents me from bringing them in front of a jury, because there is none that would deny me my right to take them to court. Instead they found a case from long ago, Heck v Humphry, 512 U.S. 477 (1994) where a defendant was able to avoid responsibility and cite it as if it were a relevant precedent but it is not. In this case the defendants actively protected the license and made a deal with someone who admits their own crimes and admits to have dealt with the defendants, and the defendants sent their own representative to lie at my trial about his inspection making me responsible for the misdeeds of the person they had already cut a deal with. Their precedent is irrelevant to this case because no defendant would stoop so low and then admit their own prejudice as freely as these defendants have on multiple occasions in these pretrial motions. They admit the hearing was going to

be a sham anyway because they had made up their minds before it; they lie about their mailings to conceal from the court that they had no interest in respecting my right to due process.

Also, for the government to pretend they would not make a deal with someone they acknowledged committing misdeeds pretends away the fact that every time they revoke a license they are in essence making a deal. This case is about the very prejudicial actions of the government against me and as ever and as evidence of that prejudicial behavior I show how they showed favoritism to someone they admittedly caught a criminal he has his license I don't. The Defendants' very direct representative lied on the stand to help take away my license so the Government's prejudice is self-evident . All they do is lie and use bad reasoning; this response provides a number of clear examples. **The question is how can anything the government say in this case be regarded as anything other than disingenuous?**

## CONCLUSION

The Plaintiff wanted a hearing so that she could show that the conviction was gained through smoke and mirrors and a misrepresenting of the law to the jury; A Board of licensed professional familiar with the law would recognize that if they wanted to. A competent attorney would present the Plaintiff's side. A board who struck a deal with a witness so that he could keep his license if he helped convict the Plaintiff should have to either explain their bias against the Plaintiff and their favoritism for him or treat the Plaintiff fairly. A competent attorney would show up and challenge them on this. It does not take a stellar attorney to realize something is wrong when the Plaintiff's attorney did not show up at the hearing.. It just takes a decent human being to own up to that fact, but it takes something far less to pretend that what the Board did was on the up-and-up as the Defendants are doing. **An attorney who takes a client's money but doesn't even show up to do his job clearly is a sign for the Defendants to HALT the hearing if they were intending on holding an actual hearing but they have already admitted that they were not holding an actual  hearing  but instead conducting a maccobe ritual to take my license regardless of what I or what my attorney was supposed to say.**

The purpose of this lawsuit is to hold the Defendants accountable for their prejudicial behaviors against me and their denial of my due process in their numerous pretrial motions meant to help them evade responsibility for their own misdeeds. The Defendants have shown themselves to be disingenuous to willfully lie

to the Court about something as mundane as mailings and they admitted that the hearing was just a sham and that their decision was already made. The Defendants also admit that they had an investigation into Goloff's misdeeds which he admitted on the stand at my trial but they refused to open that investigation up to scrutiny and they also have not dealt with the simple fact that their inspector inspected Goloff and had no dealings with me in the pharmacy and yet testified as if he inspected me. ***Therefore, the Plaintiff is requesting for the full disclosure of the investigation***

Inspector Bat lied at my trial to help gain a conviction; **can there be anything more prejudicial**?

The Defendants fear that a jury will see this governmental agency in their abuses of power and their inability to even realize when their own words expose their own misdeeds. **The very fact that they revoke my pharmacist license by holding a hearing in my absence and without my knowledge is clearly prejudicial and a denial of my due process.**

The Plaintiff, Lena Lasher, hereby certifies that she has this 16th day October 2019 caused a copy of the foregoing "Dear Attorney Deibert's letter of October 16, 2019" upon the persons and in the manner indicated below which service satisfies the requirements of PA. R.A.P. 121:

Service by first-class mail, postage prepaid, addressed as follows:

United States District Court
for the Middle District of Pennsylvania
Clerk of the Court
*PO Box 983, 228* Walnut
Harrisburg, PA 17108

Attorney General Josh Shapiro, DAG Alison Deibert
Commonwealth of Pennsylvania
15th Floor Strawberry Square
Harrisburg, PA 17120

Respectfully submitted,

Date: October 16, 2019

*lenalasher*

Lena Lasher, Pro-se Plaintiff, 16 Patton Street, High Bridge, New Jersey, 08829

*Exh C*

914

F58sLAS4                        Pizzuti - direct

1          MR. RICHENTHAL:  Your Honor, would you like us to call

2     our next witness?  The government calls Thomas Bat.

3          THE COURT:  Go ahead.

4      THOMAS BAT,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7     DIRECT EXAMINATION

8     BY MR. RICHENTHAL:

9     Q.  Good afternoon.

10    A.  Good afternoon.

11    Q.  Where are you from?

12    A.  Wilkes-Barre, Pennsylvania.

13    Q.  What is your educational background?

14    A.  I have a BA degree in criminal justice from Kings College.

15    Q.  Where did you work after getting your degree?

16    A.  First, I worked as a correctional officer at CSI Dallas in

17    Pennsylvania, and then I transferred to another job, another

18    state job.

19    Q.  What was the state job in which you transferred to?

20    A.  An investigator for the Department of State.

21    Q.  What, in short, is the Department of State?

22    A.  The Department of State is a conduct-level agency in

23    Pennsylvania.  And what we do is license professionals,

24    27 professional licensing boards.

25    Q.  For how long did you work for the Department of State?

915

F58sLAS4                      Bat - direct

1    A.  27 years.

2    Q.  Did you have a title or titles while you were there?

3    A.  Professional conduct investigator.

4    Q.  Did you have a title for a period of time prior to that?

5    A.  Yes.  When I first joined, I was an inspector called a

6    regulatory inspector, which was for about a year.

7    Q.  What kinds of businesses did you either investigate or

8    inspect?

9    A.  We had 27 licensing boards which include doctors, dentists,

10   veterinarians, pharmacies, engineers, architects, nurses, quite

11   a range of professions.

12   Q.  Did you receive any kind of training in connection with

13   either serving as an inspector or investigator?

14   A.  Most of the training was on the job.  We did have some

15   specialized training to clear in confidence.

16   Q.  Are you still an investigator?

17   A.  No, sir.  I retired in May 2014.

18   Q.  During the course of your career, approximately how many

19   pharmacies did you either inspect or investigate?

20   A.  It's hard to gauge because it wasn't on a regular basis.

21   You might do two pharmacies one month, and then maybe not do

22   any pharmacies for six months in a row.

23          MR. RICHENTHAL:  Can I have just one moment, your

24   Honor?

25          THE COURT:  Yes.

916

F58sLAS4                    Bat - direct

1              MR. RICHENTHAL:  May I proceed, your Honor?

2              THE COURT:  Yes.

3    BY MR. RICHENTHAL:

4    Q.  Directing your attention to 2012, did there come a time

5    when a complaint was filed with respect to Hellertown Pharmacy

6    and Palmer Pharmacy & Much More?

7    A.  That is correct.

8    Q.  Approximately when was it filed?

9    A.  February of 2012.

10   Q.  By whom was it filed?

11   A.  A former employee named Dan Geiger.

12   Q.  Without getting into details, what was the nature of the

13   allegations in the complaint?  What was the subject matter?

14   A.  He made several complaints, some being just facility

15   requirements of the pharmacy, and some were very serious

16   charges against what the pharmacist --

17             MR. FREEMAN:  Objection.  Objection to "serious."

18   BY MR. RICHENTHAL:

19   Q.  No need to characterize serious or not, what were the

20   subject matters?  What types of things?

21   A.  One of the complaints was they were restocking medication.

22   Q.  Was an investigation commenced?

23   A.  Yes.

24   Q.  Were you assigned to lead that investigation?

25   A.  Yes, I was.

F58sLAS4                        Bat - direct

1    Q.  What were some of the initial steps taken in the

2    investigation?

3    A.  The first thing we do is to check prior licensure, see what

4    the licensees were like, the pharmacy and the pharmacist, do a

5    little background check.  The second stage would be to go talk

6    to the complainant.

7    Q.  Did you do that?

8    A.  Yes, I did.

9    Q.  Did you also speak with others?

10   A.  Yes.  The complainant supplied witnesses' names.

11   Q.  Did there come a time when you visited one or both

12   pharmacies?

13   A.  Yes.

14   Q.  Approximately when was that?

15   A.  September 18.

16   Q.  Of what year?

17   A.  2012.

18   Q.  Were these surprise inspections or informed in advance?

19   A.  Surprise investigations.

20   Q.  Who, if anyone, accompanied you to the inspection?

21   A.  I brought with me a pharmacy inspector, Michael

22   Fitzpatrick.

23   Q.  Which of the two pharmacies did you visit first?

24   A.  First was Hellertown.

25   Q.  Approximately what time of day did you visit?

918

F58sLAS4                        Bat - direct

1    A.  It would be late morning.

2    Q.  Was a pharmacist present?

3    A.  Yes.

4    Q.  Who?

5    A.  Stephen Goloff.

6    Q.  Did you speak with him?

7    A.  Yes.

8    Q.  Did he answer your questions?

9    A.  Yes.

10   Q.  What was his demeanor?

11   A.  Very cooperative.

12   Q.  Do you recall approximately how large the public area of

13   the pharmacy was?

14   A.  It was a very small pharmacy, what we call in the trade a

15   mom-and-pop, compared to the larger pharmacies such as CVS and

16   Walgreens.

17   Q.  Did the pharmacy also contain back rooms, that is,

18   nonpublic rooms?

19   A.  Yes.

20   Q.  Did you inspect those rooms?

21   A.  Yes, that was part of the inspection.

22   Q.  Were photographs taken of certain areas of the pharmacy?

23   A.  Yes.

24   Q.  Were you present when they were taken?

25   A.  Yes, and some I directed to be taken.

F58sLAS4                        Bat - direct

1    Q.  If you could look at what is marked for identification --

2    I'll walk up to you Government Exhibits 301 through 313.  Take

3    a moment and leaf through those.  Let me know if you recognize

4    them.

5    A.  Yes, I do recognize them.

6    Q.  What are those, Mr. Bat, without describing them?  One by

7    one, what's the set?

8    A.  Excuse me, what?

9    Q.  Without describing them one by one, what is the set of

10   things just handed you?  What are those?

11   A.  Photographs.

12   Q.  Photographs of what?

13   A.  Of the pharmacy, different parts of this pharmacy that we

14   were taking.

15   Q.  Taken during the inspection?

16   A.  Correct.

17          MR. RICHENTHAL:  Government offers 301 through 313.

18          MR. FREEMAN:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibits 301 through 313 received in

21   evidence)

22          MR. RICHENTHAL:  Ms. Chen, can you put 304 on the

23   screen.

24   BY MR. RICHENTHAL:

25   Q.  Mr. Bat, turn to 304, or as your screen warms up, you

F58sLAS4                     Bat - direct

1    should see it in a moment.

2    A.   304?

3    Q.   304.  It should also now be on the screen to your right.

4    A.   Yes.

5    Q.   Do you recognize these?

6    A.   Yes.  These are bins that we found in the back room.

7    Q.   Do you recall what was in these bins?

8    A.   Yes.  Each one contained bottles of medication.

9    Q.   Were the bottles individually labeled?

10   A.   No.

11            MR. RICHENTHAL:  Ms. Chen, can you now put up 310.

12   Q.   Is that an example of the inside of one of the bins?

13   A.   Yes.  That's an interior photo.

14            MR. RICHENTHAL:  Ms. Chen, can you put up 302.

15   Q.   Mr. Bat, do you recognize these?

16   A.   Yes.  These were vials that we found in the dispensing area

17   of the pharmacy.

18   Q.   You say "the dispensing area."  What was near these vials?

19   A.   The medication, the vials, vials to be filled, the

20   prescriptions, the drugs would be taken to be counted and

21   measured.

22            MR. RICHENTHAL:  May I have a moment, your Honor?

23            THE COURT:  Yes.

24   BY MR. RICHENTHAL:

25   Q.   Mr. Bat, I'm going to bring to you Government Exhibit 1001

F58sLAS4                        Bat - direct

1    in evidence.  Do those appear similar?

2    A.  Yes, they are.

3    Q.  To the bottles that you saw?

4    A.  That is correct.

5           MR. RICHENTHAL:  Now, could we go back, Ms. Chen, to

6    Government Exhibit 304.

7    Q.  Mr. Bat, do you recall approximately how many bins like

8    this were in Hellertown Pharmacy?

9    A.  Over 100, I think 117 to be exact.

10   Q.  At the end of the inspection, did Hellertown Pharmacy pass

11   or fail the inspection?

12   A.  It failed.

13   Q.  Was that conveyed to anyone?

14   A.  Oh, yes.  The supervising pharmacist that day.

15   Q.  Was the failure also thereafter transmitted to anyone

16   electronically, for example, by e-mail?

17   A.  Yes.  The pharmacy inspectors, Mike would have sent it by

18   e-mail.

19   Q.  To whom?

20   A.  To the supervising pharmacist.

21   Q.  In that case, in this case, in this pharmacy who was that,

22   do you recall?

23   A.  Stephen Goloff.

24   Q.  Would it also have been provided to the pharmacist in

25   charge, that is the official licensee?

922

F58sLAS4                        Bat - direct

1    A.  Not necessarily.  It would be up to Mike if he wants to

2    send to both.  Normally, the procedure is to give it to the

3    supervising pharmacist.

4    Q.  When you say "give," you mean physically?

5    A.  No, sent electronically.

6    Q.  I'm going to show you what has been marked for

7    identification as Government Exhibit 4004.  First, do you

8    recognize the sender?

9        Let me back up.  Is this an e-mail?

10   A.  Yes.

11   Q.  Do you recognize the sender?

12   A.  Yes.

13   Q.  Who is the sender?

14   A.  Michael Fitzpatrick.

15   Q.  Is that the individual that accompanied you?

16   A.  Yes.  This is the pharmacy inspector.

17   Q.  Do you recognize the recipient?

18   A.  Yes.  It's to Lena Lasher.

19   Q.  At a particular --

20   A.  Yes, I'm sorry, at yahoo.com.

21   Q.  Now, can you turn to the second page.  Without reading what

22   is on there, is that the indication that the pharmacy had

23   failed?

24   A.  Yes.

25   Q.  What's the date of that e-mail?

F58sLAS4                         Bat - direct

1    A.  9/18/2012.

2    Q.  Is that the same day as the inspection?

3    A.  That is correct.

4    Q.  After you inspected Hellertown Pharmacy, where did you go?

5    A.  We went to the Palmer Pharmacy.

6    Q.  That's the other pharmacy that was the subject of the

7    complaint?

8    A.  That is correct.

9    Q.  Did you perform an inspection there as well?

10   A.  Yes, we did.

11   Q.  Who, if anyone, accompanied you?

12   A.  Michael Fitzpatrick.

13   Q.  The same individual as the first pharmacy?

14   A.  That's correct.

15   Q.  Approximately what time of day did you arrive to the second

16   pharmacy?

17   A.  Early afternoon.

18   Q.  Now, that second pharmacy, how did its public area, front

19   area, compare to the first pharmacy?

20   A.  It was a larger pharmacy.

21   Q.  Did it also have back areas, that is, nonpublic areas?

22   A.  That is correct.

23   Q.  Did your inspection include those areas?

24   A.  Yes.

25   Q.  Were photographs taken of at least some of those areas?

F58sLAS4                    Bat - direct

1    A.  Yes.

2    Q.  I'm going to walk up to you what's been marked in

3    identification as Government Exhibits 401 through 407.  Just

4    take a moment and leaf through those, and let me know if you

5    recognize them.

6    A.  Yes, I recognize them.

7    Q.  What are those, Mr. Bat?

8    A.  These were photos that were taken at that time of the

9    inspection.

10          MR. RICHENTHAL:  Government offers 401 through 407.

11          MR. FREEMAN:  No objection.

12          THE COURT:  Received.

13          (Government's Exhibits 401 through 407 received in

14   evidence)

15          MR. RICHENTHAL:  Ms. Chen, can you put 402 and 403 on

16   the screen.

17   BY MR. RICHENTHAL:

18   Q.  Do you recognize these, Mr. Bat?

19   A.  Yes.

20   Q.  Do you recall what was in these, if you knew?

21   A.  Yes.  They were very similar to the one we found at

22   Hellertown.  They were bottles of medication.

23   Q.  Were the bottles or vials individually labeled?

24   A.  No.

25   Q.  Approximately how many bins like this were in Palmer

F58sLAS4                    Bat - direct

1    Pharmacy?

2    A.  I believe the number was 28.

3    Q.  The other one was more than 100?

4    A.  117.

5         MR. RICHENTHAL:  Can you now turn to 401, Ms. Chen.

6    Q.  Do you recall finding this, Mr. Bat?

7    A.  Yes.  That was in the Palmer Pharmacy, in the dispensing

8    area.  In fact, the photo actually shows it in the dispensing

9    area.

10   Q.  When you say the photo shows it, are you referring to the

11   amber vials behind that is for measuring?

12   A.  That is correct.

13   Q.  The ones on the left are filled?

14   A.  Yes.

15   Q.  The ones on the right in the back are empty?

16   A.  That is correct.

17   Q.  At the end of the inspection, did Palmer Pharmacy pass or

18   fail the inspection?

19   A.  It failed.

20   Q.  Was that conveyed to anyone?

21   A.  Yes.

22   Q.  How?

23   A.  It would have been sent by Mike.  He, first of all, had the

24   pharmacist sign the inspection form and then sent as an e-mail.

25   Q.  When you say the pharmacist signed, you mean the person on

F58sLAS4                    Bat - direct

1    duty?

2    A.  That's correct.

3    Q.  This was a different pharmacist from the pharmacist at

4    Hellertown?

5    A.  Yes.

6              MR. RICHENTHAL:  Your Honor, I think it's 2:15.  I

7    don't have a lot of time left with Mr. Bat, but it is Friday

8    afternoon.  I want to let the court know it's 2:15.

9              THE COURT:  All right.  Have a great weekend.  It's

10   supposed to be nice.  Just remember the rules, don't talk about

11   the case, keep an open mind.  Thank you very much for your

12   attention and enjoy the weekend.  See you bright and early and

13   fresh on Monday morning.

14             (Jury excused)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F5belas1

1                  (In open court; jury present)

2                  THE COURT:  Good morning, everyone.  Sorry to keep

3      you.  The lawyers and I had some matters to discuss.

4                  I hope you all had a nice weekend.

5          THOMAS BAT,

6               called as a witness by the Government,

7               having been duly sworn, testified as follows:

8      DIRECT EXAMINATION

9      BY MR. RICHENTHAL:

10     Q.  Good morning, Mr. Bat?

11     A.  Good morning counselor.

12     Q.  Welcome back.

13                 When we ended on Friday afternoon, you just testified

14     that Hellertown Pharmacy and Palmer pharmacy had failed the

15     inspections of September 18, 2012.  Do you recall testifying

16     about that?

17     A.  That is correct.

18     Q.  And then you testified that an e-mail containing a copy of

19     the inspection report with respect to Hellertown was sent to an

20     e-mail address at the address Lena Lasher at Yahoo?

21     A.  That is correct.

22     Q.  Let me pick up the story of that moment.  Did there come a

23     time soon after that when you spoke with Lena Lasher, also

24     known as Lena Contang?

25     A.  Yes, I did.

F5belas1                     Bat - direct

1    Q.  How did that come about?

2    A.  It was a telephone call to set up an appointment to meet

3    and discuss what happened at the pharmacy.

4    Q.  Just to be clear, Mr. Bat, who wished to set up the

5    appointment, you or Ms. Lasher?

6    A.  I'm not sure, but it would be more likely the respondent

7    would call me.

8    Q.  And the call itself, in other words, who wished to set up

9    the meeting, you or her?

10   A.  It would probably be her.

11   Q.  Did you, in fact, meet with her?

12   A.  Yes, I did.

13   Q.  Approximately when?

14   A.  It was two days later, September 20th.

15   Q.  Where did you meet with her?

16   A.  At a restaurant that's only a few storefronts away from the

17   pharmacy at Hellertown.

18   Q.  Did anyone accompany her to the meeting?

19   A.  Yes.  There were two other people.

20   Q.  Who were those people?

21   A.  Peter Riccio, Carl Riccio, and a one of the techs from the

22   pharmacy, pharmacy tech.

23   Q.  At the outset of the meeting, how, if at all, did

24   Ms. Lasher describe her roles at Hellertown Pharmacy and Palmer

25   pharmacy?

946

F5belasl                        Bat - direct

1    A.  She was a supervising pharmacist for both pharmacies.

2    Q.  That's how she described herself?

3    A.  Yes.

4    Q.  What types of subjects in general did you talk about with

5    Ms. Lasher?

6    A.  I had a format of issues I wanted to be -- or areas of

7    concern I wanted to be addressed.  And I'd ask those particular

8    questions.

9    Q.  Did they cover more than one subject?

10   A.  Yes.

11   Q.  Now, before getting to those subjects, did you tell

12   Ms. Lasher who the complainant was?

13   A.  No.

14   Q.  That is, who filed the complaint?

15   A.  No, I did not.

16   Q.  Did you tell her which employees you'd previously

17   interviewed?

18   A.  No, I did not.

19   Q.  Did you tell her what certain previous employees had told

20   you?

21   A.  No.

22   Q.  Let's talk about a few of the subjects one at a time.

23        So, first, did you ask Ms. Lasher about the pharmacy's

24   sick employee policy?

25   A.  Yes, I did.

947

F5belas1                          Bat - direct

1    Q.  What did she say?

2    A.  She said that the policy is that if someone is sick,

3    they're to take the day off and not to be seen by the

4    pharmacist themself.

5    Q.  Did you ask Ms. Lasher about the bins or totes that you'd

6    seen?

7    A.  Yes, I did.

8    Q.  Did Mr. Peter Riccio say something at that point?

9    A.  Not at that point, but he did comment later on about --

10            MR. FREEMAN:  Objection.

11   Q.  Did Mr. Peter Riccio comment at some point during the

12   interview?

13   A.  Yes, he did.

14   Q.  Was it in response to the phrase "mail order"?

15   A.  Yes, he did.

16   Q.  What did Mr. Peter Riccio say?

17   A.  He didn't believe he did that much; the two pharmacies that

18   his company owned did not do that much mail order.

19   Q.  He said they did not do that much mail order?

20   A.  That is correct.

21   Q.  Now, at that moment did Ms. Lasher say anything in response

22   to his statement?

23   A.  No.

24   Q.  Did she contradict his statement?

25   A.  No, she did not.

948

F5belas1                          Bat - direct

1    Q.  Did she seek to correct, revise or expand his statement?

2    A.  No, she did not.

3    Q.  Did the interview continue?

4    A.  Oh, yes.

5    Q.  Now, on Friday you testified about measuring vials you'd

6    seen.  I showed you photographs of measuring vials with a line

7    around them?

8    A.  Correct.

9    Q.  Do you recall that?

10   A.  Correct.

11   Q.  Did you ask Ms. Lasher about what those vials were used

12   for?

13   A.  Yes, I did.

14   Q.  What did she say in response?

15   A.  She explained a pharmacist or tech would take -- would

16   count the pills out, say 100 pills, and then put them into that

17   master vial, and after that would eyeball it and then put it

18   into a new vial that now had the address and information from

19   the patient.

20   Q.  Let me pause for a second.  When you say count out 100

21   pills, did she tell you this was pill by pill?

22   A.  Yes.

23   Q.  So what was the process she -- you understood her to be

24   telling you occurred with respect to these measuring vials?

25   Step one, pills are counted by hand, pill by pill?

949

F5belas1                    Bat - direct

1   A.  Correct.

2   Q.  And then step two is what?

3   A.  Put it into the marked bottle -- we were calling it the

4   master vial.

5   Q.  And then step three?

6   A.  After you eyeballed it -- that was her words, not mine --

7   after she eyeballed it, she would put it -- or the pharmacy

8   tech or pharmacist would now put it into the correct vial, the

9   one that would be going out.

10  Q.  Now, after Ms. Lasher told you that was the process, did

11  you ask her a follow-up question?

12  A.  Yes, I did, because it didn't make any sense to me.  So I

13  asked her to explain it a second time.

14  Q.  Did she explain it a second time?

15  A.  Yes, she did.

16  Q.  Did she once again explain it involved counting by hand,

17  pill by pill?

18  A.  That is correct.

19  Q.  Now, did you also ask Ms. Lasher a different subject,

20  whether pills which had been returned to the pharmacy were then

21  redispensed to other customers?

22  A.  That was one of the topics.

23  Q.  What, if anything, did she say in response to that?

24  A.  She said they do not recycle their pills.  They get

25  destroyed.

950

F5belas1                        Bat – direct

1    Q.  She said they were destroyed?

2    A.  Correct.

3    Q.  Did she say who destroyed them?

4    A.  She was the only one authorized to destroy them.

5    Q.  Did you ask Ms. Lasher about prescriptions for controlled

6    substances, and specifically suspicious prescriptions?

7    A.  Yes, I did.

8    Q.  Did she say anything with respect to whether the pharmacies

9    had out-of-state doctors' customers?

10   A.  She said that she had checked, and that everything was

11   above board and everything was correct.

12   Q.  Did she say whether they had a fair number, or lack

13   thereof, of out-of-state customers for controlled substance

14   prescriptions?

15   A.  She said she had very little out-of-state prescriptions.

16   Q.  Now, that was a question about controlled substances

17   generally.  Let me ask a particular one.

18            Did you ask Ms. Lasher about a prescription or

19   prescriptions for opium tincture?

20   A.  Yes, I did.

21   Q.  What did she say about a prescription or prescriptions for

22   opium tincture?

23   A.  She informed me that a patient had a diarrhea problem, and

24   that his doctor had prescribed that for him.

25   Q.  Let me pause.  You said a patient and his doctor.

951

F5belas1                          Bat - direct

1   A.  That's correct.

2   Q.  Did you understand her to be referring to two different

3   people?

4   A.  That is correct.

5   Q.  Did you also ask Ms. Lasher whether the pharmacist, as

6   opposed to a technician, was the last person to review

7   prescriptions before they left the pharmacists?

8   A.  Yes.  We did discuss that topic.

9   Q.  What did she say, Mr. Bat?

10  A.  She said the last person to look at the prescription before

11  it went out would have been the pharmacist.

12  Q.  Did she say that was true for every prescription?

13  A.  That is correct.

14  Q.  At the close of the interview did you offer Ms. Lasher the

15  opportunity to do anything?

16  A.  Yes.  It's our protocol to have any licensee respond

17  directly to the board in their own words.  It's not going to be

18  filtered.  It's not going to be looked at by anyone else,

19  except the board itself.  So they're given the choice to do a

20  written response, an option.

21  Q.  I'm sorry?

22  A.  It's an option.

23  Q.  When you say "the board," to what are you referring?

24  A.  The pharmacy board.

25  Q.  And you said "it's an option."  What do you mean by that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F5belas1                    Bat - direct

1   A.  They don't have to do it.  There's -- nothing is held

2   against them if they don't comply with it.

3   Q.  How did Ms. Lasher react to that opportunity?

4   A.  She said she would like to reply, send a written letter in.

5   Q.  Now, before I talk about something else, you've listed a

6   few different subjects you went over with Ms. Lasher.  Were

7   some of these more central to the mission of the board or of

8   the inspection?

9   A.  Yes.

10  Q.  Which ones?

11  A.  The ones -- the things such as returning medications once

12  they leave the pharmacy and coming back and being recycled;

13  having -- it's hard to distinguish between what was major, what

14  was minor at this point.

15  Q.  Well, what was more central to the regulatory mission of

16  the board?  For example, things like a sick policy or things

17  like labeling, storage of pills?

18          MR. FREEMAN:  Object to the form of the question.

19  Q.  In your own words, Mr. Bat, what was more central to the

20  mission of the board?

21          MR. FREEMAN:  Object to the form of the question.

22          THE COURT:  That's not a question.

23  Q.  Mr. Bat, among the subjects you talk about with Ms. Lasher,

24  what did you view as more meaningful?

25  A.  Well, as I explained, the drugs going out of the pharmacy

F5belas1                     Bat - direct

1    and coming back and being recyclable, that's a really -- would

2    be a really big issue.

3    Q.  How about how drugs were labeled and stored?

4    A.  Up until that point I've never saw that before in any

5    pharmacy.

6    Q.  When you say that you'd never seen that before, Mr. Bat,

7    are you referring to the storage of totes in this pharmacy?

8    A.  That is correct.

9    Q.  You'd never seen pills stored that way before?

10   A.  Never.

11   Q.  How many pharmacies have you been in at your time as an

12   inspector?

13   A.  After 27 years, it's hard to give a count, but at one time

14   in 2010 we were tasked to do pharmacy inspections two or three

15   a week.  So I got very familiar with doing the mom-and-pop

16   pharmacies and the larger pharmacies and so forth.  So quite a

17   lot of experience.  But to give a number, I would have no idea

18   how many that would have been.

19   Q.  Well, in all of that experience, did you ever see pills

20   stored in totes this way?

21   A.  Never.

22   Q.  Did you ever see individual vials not labeled this way?

23   A.  Never.

24   Q.  Did you ever see paper pieces on the outside of a tote

25   labeled the way you'd seen them?

954

F5belas1                    Bat - direct

1   A.  Never.

2   Q.  Did you ever see counting vials or measuring vials the way

3   you talked about?

4   A.  Once again, never.

5   Q.  Let me step back to -- let me pause.  You said you'd seen

6   both mom-and-pop stores and larger stores?

7   A.  Yes.

8   Q.  Your answers never -- were those the same for mom-and-pop

9   and larger stores?

10  A.  The rules and regulations are the same for both.

11  Q.  Let me step back to your conversation with Ms. Lasher.  You

12  said you offered her the opportunity to write to the board?

13  A.  That is correct.

14  Q.  Did she take you up on the opportunity?

15  A.  Yes, she did.

16  Q.  Approximately how long after your interview?

17  A.  Several days.

18  Q.  I want to bring to you what's been marked for

19  identification as Government Exhibit 3014 and 3015.  Take as

20  much time as you need, Mr. Bat.  Let me know if you recognize

21  those.

22  A.  Yes, I recognize them.

23  Q.  What are those, Mr. Bat?

24  A.  These are letters that were sent to my office.

25  Q.  How many letters?

F5belas1                    Bat - direct

1    A.  The Scranton regional office.

2    Q.  How many letters?

3    A.  There were four all together.

4    Q.  Who were these letters signed by?

5    A.  They were signed by Lena.

6    Q.  When you say "Lena," are you referring to --

7    A.  I'm sorry.  Lena Contang.

8    Q.  Lena Contang was that the name on Ms. Lasher's pharmacy

9    license in the Commonwealth of Pennsylvania?

10   A.  That is correct.

11           MR. RICHENTHAL:  The government offers 3014 and 3015.

12           MR. FREEMAN:  No objection.

13           THE COURT:  Received.

14           (Government's Exhibits 3014 and 3015 received in

15   evidence)

16           MR. RICHENTHAL:  Ms. Chen, can you put 3014 on the

17   screen.

18   BY MR. RICHENTHAL:

19   Q.  Now, first, Mr. Bat, you said four letters.  Are they

20   substantively identical?

21   A.  They're almost identical, except for the letterheads.

22   Q.  Can you explain what you mean by that.  What was the

23   difference in letterhead?

24   A.  Two of them had the Hellertown address and two of them had

25   the Palmer pharmacy letterhead.

F5belasl                    Bat - direct

1    Q.  Otherwise was the content the same?

2    A.  That is correct.

3    Q.  Were all four signed by Ms. Contang or Ms. Lasher?

4    A.  That is correct.

5    Q.  Were they signed by anyone else?

6    A.  No.

7             MR. RICHENTHAL:  Ms. Chen, can you expand the first

8    paragraph of this letter.

9    Q.  First, Mr. Bat, do you see the date on the right, 9/24/12?

10   A.  That is correct.

11   Q.  Does that accord with your memory of approximately when you

12   received this letter?

13   A.  That would be correct.

14   Q.  That's less than a week after the inspection?

15   A.  Yes.

16   Q.  Now, do you see on the left, where it says, dear PA BOP?

17   A.  Yes.

18   Q.  What was PA BOP?

19   A.  The Bureau of Occupational and Professional Affairs.

20   There's one letter missing, should be another A on it.

21   Q.  Does that include the Board of Pharmacy?

22   A.  Yes, it does.

23   Q.  Now, could you read the first paragraph, please.

24   A.  The entire paragraph?

25   Q.  Yes, sir.

F5belas1                    Bat - direct

1    A.  I would address each of the inspector's concerns later in

2    this letter.  First, I must express the complete disappointment

3    I have been -- that I have developed for many employees that I

4    have hired.  I have no doubt that the reason that I was put

5    through this embarrassment and humiliation is because of a

6    pharmacist that I had to let go for incompetency.  I can say so

7    much more, but I would just leave it at that.  Many employees

8    come and go.  Most do not have the same work ethic that I need

9    and portray.  When we find a good employee, they love to work

10   for me.  They want to get paid and do nothing, they have a

11   problem with me.  To write or call you complaining about me or

12   the stories -- I'm sorry, strike that.  To write or call you

13   complaining about me or the stores I supervise is something

14   that breaks my heart and makes me question whether or not it is

15   all worth it.

16   Q.  Now, Mr. Bat, could you go down a little farther on the

17   letter, please.  Do you see a series of numbered sentences or

18   paragraphs?

19   A.  Correct.

20   Q.  Could you read the first one, please.

21   A.  Number one, Lena Contang is the pharmacist in charge of

22   Hellertown Pharmacy.  Steven Goloff is the pharmacist in charge

23   of the Palmer Pharmacy & Much More.  Lena Contang is the

24   managing partner of both pharmacies.

25   Q.  Now, could you go down to number eight, which I believe

958
F5belas1                    Bat - direct

1    goes on to the next page.

2         MR. RICHENTHAL:  Ms. Chen, if you could highlight

3    number eight, please.

4    A.  Number eight.  Both Hellertown Pharmacy and Palmer

5    Pharmacy & Much More have a sick policy in which a sick note

6    must indicate when an employee can return to work so that

7    he/she does not contaminate the other employees.  A pharmacist

8    never diagnoses anyone, including an employee.  Parentheses,

9    the sick policy was previously incorrectly told to the

10   investigator by the pharmacist on duty, parentheses.

11   Q.  Let me pause for a second.  Do you see where it says, the

12   sick policy was previously incorrectly told to the investigator

13   by the pharmacist on duty?

14   A.  Correct.

15   Q.  Did you tell Ms. Lasher what certain employees had told you

16   or not told you?

17   A.  No.

18   Q.  Would you go to number 14, please.

19   A.  Fourteen, all prescriptions are verified by pharmacist.

20   The pharmacist is the last check of all prescriptions.

21   Q.  Did that accord with what she told you when you met her?

22   A.  Yes.

23   Q.  I should have asked this earlier:  Does the sentence you

24   read earlier about the sick policy also accord with what you

25   were told when you met her?

959

F5belas1                    Bat - direct

1   A.  Yes.

2   Q.  And when I say "her," I'm referring to Ms. Lasher.

3   A.  That is correct.

4   Q.  Do you see number 13?

5   A.  Yes.

6   Q.  Could you read that.

7   A.  Number 13, Lena speaks for all doctors that we directly do

8   business with every month regarding patients' prescriptions.

9   Q.  You understood Lena to be referring to Ms. Lasher herself?

10  A.  That is correct.

11  Q.  Go to number 16, please.

12  A.  Number 16, all return prescriptions, parentheses, any

13  prescriptions that have left the pharmacy, parentheses, are

14  destroyed by Lena.  Steven Goloff incorrectly told you that we

15  return to stock.  We never return any prescriptions that had

16  been left in the pharmacy to stock.  This is my, parentheses,

17  Lena, parentheses, department.

18  Q.  Does that accord with what Ms. Lasher told you when you met

19  her?

20  A.  Yes.

21  Q.  Let me pause a second again.  The middle sentence says,

22  Steven Goloff incorrectly told you returned to stock, had you

23  told Ms. Lasher what Mr. Goloff told you?

24  A.  No, I did not.

25  Q.  Finally, could you go to number 17, please.

F5belas1                        Bat - direct

1    A.  Number 17.

2    Q.  Do you see the last sentence there, we do have?  Do you see

3    where it says, we do have a marked vial?

4    A.  Yes.

5    Q.  Could you read that sentence.

6    A.  We do have a marked vial as a guide because we have certain

7    pharmacists or techs who wanted to use a marked vial to

8    doublecheck their count.

9    Q.  Now, this reference to count, based on your conversation

10   with Ms. Lasher, did you understand that to refer to a

11   pill-by-pill count?

12   A.  That is correct.

13   Q.  Do you see the sentence above, where it says, because all

14   are of our prescriptions are either hand counted or machine

15   counted?  Do you see that, Mr. Bat?

16   A.  The complete sentence, it starts with if?

17   Q.  Do you see the highlighted portion?

18   A.  I see the highlighted.

19   Q.  Could you now read the entire sentence, please.

20   A.  If the same patient orders one quantity three times, we no

21   longer fill that for that patient, because all of our

22   prescriptions are either hand counted or machine counted.

23   Q.  Based on your conversation with Ms. Lasher, did you

24   understand this to be pill by pill, whether either by hand or

25   by machine?

F5belas1                          Bat - direct

1    A.  Yes, that's correct.

2              MR. RICHENTHAL:  Could I have a moment, your Honor.

3              THE COURT:  Yes.  (Pause).

4    Q.  Could you go to number 12, Mr. Bat.  Do you see where it

5    says, as for the opium RX in question?

6    A.  Yes.

7    Q.  Could you read the paragraph beginning with that phrase.

8    A.  As for the opium prescription in question, the doctors said

9    the patient has severe diarrhea and nothing works except for

10   paregoric or opium.  Since paregoric was no longer made, the

11   patient had no choice except for taking the opium.  Otherwise,

12   the patient has to go for surgery.  It's in unclear if the

13   patient improved or went for surgery, because the last time the

14   patient filled an opium prescription was on 1/7/12.

15   Q.  This paragraph refers to the doctor and the patient.  Do

16   you see that?

17   A.  Yes.

18   Q.  Did you understand those to be two different people, based

19   on speaking with Ms. Lasher?

20   A.  That would be correct.

21   Q.  At any point in your conversation with her did she lead you

22   to believe they were the same person?

23   A.  No.  It sounded like two different people, a doctor and a

24   patient.

25             MR. RICHENTHAL:  If you could now turn to the end of

F5belas1                    Bat - direct

1    the letter, please.  Go to the next page, Ms. Chen.

2    Q.  Could you read the final sentences before, thank you for

3    your time.

4    A.  Starts with "we are," that one?

5    Q.  Yes, sir.

6    A.  We are always open to inspection.  I will love for you to

7    come back, inspect us or to show that BOP the corrections we

8    made, along with our new and improved policies.  Thank you for

9    your time.

10   Q.  Now, the other three letters, they were identical?

11   A.  That is correct.

12   Q.  100 percent?

13   A.  Yes.

14          MR. RICHENTHAL:  Ms. Chen, could you just turn to the

15   first letter with Palmer letterhead.

16   Q.  Do you see this, Mr. Bat?

17   A.  With the letterhead?

18   Q.  Yes, sir.

19   A.  Yes.

20   Q.  Is that the letterhead on Palmer that you're referring to?

21   A.  Yes.

22   Q.  Again, is it addressed to PA BOP?

23   A.  Yes.

24   Q.  Same date?

25   A.  Yes.

963

F5belasl                        Bat - direct

1              MR. RICHENTHAL:  Ms. Chen, could you turn to the

2    signature page.

3    Q.  Same signature?

4    A.  Yes.

5              MR. RICHENTHAL:  No further questions for Mr. Bat.

6    CROSS EXAMINATION

7    BY MR. FREEMAN:

8    Q.  Good morning.

9    A.  Good morning, sir.

10   Q.  Tell us again what BOP stands for.  I know there's a letter

11   missing.

12   A.  Bureau of Professional Occupational Affairs.

13   Q.  So your role is an investigator for BOP?

14   A.  No, sir.  I work for BEI, Bureau of Enforcement

15   Investigation.  We do the investigations for the Bureau of

16   Professional and Occupational Affairs.

17   Q.  So on a flow chart, would it be underneath or side to side?

18   A.  Equal.

19   Q.  Equal.  And you inspect not only pharmacies but other

20   businesses?

21   A.  Twenty-seven licensing boards.

22   Q.  But we're talking in this case about pharmacy?

23   A.  That is correct.

24   Q.  And you've done a number of those inspections over the

25   years, and 2010 you were doing maybe two or three a week?

964

F5belas1                    Bat - cross

1   A.  That's correct.

2   Q.  Had you ever inspected an online pharmacy?

3   A.  No, sir.

4   Q.  This was the first one?

5   A.  Yes.

6   Q.  And in Pennsylvania, the regulation does not prohibit an

7   online pharmacy?

8           MR. RICHENTHAL:  Objection.

9           THE COURT:  Sustained.

10  Q.  Is it rare for -- withdrawn.  Let me start a different one.

11          When you did the inspection, the pharmacy failed?

12  A.  Correct.

13  Q.  That doesn't mean that the pharmacy is closed, am I

14  correct?

15  A.  No.

16  Q.  And in this case the pharmacy wasn't closed?

17  A.  No, it was not.

18  Q.  Kept on in its business?

19  A.  Correct.

20  Q.  What is the procedure after the failure?  Does the pharmacy

21  have a certain amount of time to get up to code, so to speak,

22  or --

23  A.  In some cases, they do.  If it's a minor situation, such as

24  missing a pharmacy sign, they're allowed 30 days to correct it.

25  Q.  And what if it's a major situation?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F5belas1                    Bat - cross

1   A.  Then it goes to the board for further action.

2   Q.  Would this case have gone to the board?

3   A.  Yes.

4   Q.  Did it go to the board?

5   A.  I have no idea.

6   Q.  That's not part of your --

7   A.  No.

8   Q.   -- involvement?

9   A.  No, sir.

10  Q.  When you sat down with Ms. Lasher at the restaurant near

11  the pharmacy --

12  A.  Yes.

13  Q.   -- Peter Riccio was there?

14  A.  Correct.

15  Q.  And we've been talking about what Lasher said to you and

16  what you said to her.

17  A.  Yes.

18  Q.  But Peter Riccio was talking?

19  A.  Not really, sir.  I wouldn't allow him to.  The point being

20  is when I talk to a licensee, I talk to the licensee and not to

21  the owner or partner or anyone else.  But the thrust is going

22  to be towards the licensee.

23          Now, I will allow some comments by a person who has an

24  interest, such as an owner.  I would allow some interest, but I

25  won't let him dominate the conversation or ask any questions

F5belas1                    Bat - cross

1    toward him.  They would never be directed to him.  They'd be

2    directed to the licensee.

3    Q.  Would it be fair to say that he tried to insert himself in

4    the conversation?

5    A.  Every now and then.  It wouldn't be a predominant.

6    Q.  But this was your ground rules, so to speak?

7    A.  Correct.

8    Q.  And the licensee means the person who has the license?

9    A.  Yes.

10   Q.  And the license in Hellertown was granted to Lena Contang,

11   am I right?

12   A.  Yes.  Hellertown was -- yes.

13   Q.  That was the --

14   A.  Goloff was Palmer.

15   Q.  That was the store that she had the license for?

16   A.  That's correct.

17   Q.  So was Peter Riccio there as the owner?

18   A.  Yes.

19   Q.  And did he --

20           MR. RICHENTHAL:  Objection to speculation.

21   Q.  Was Peter Riccio there as the owner, if you know?

22           MR. RICHENTHAL:  Objection.  Speculation.

23           MR. FREEMAN:  I withdraw the question.

24   Q.  Did Peter Riccio tell you he was the owner?

25   A.  Yes, he did.

F5belas1                     Bat - cross

1   Q.  Is there any prohibition for owners to be present at such

2   an interview?

3   A.  No, no prohibitions.  No.

4   Q.  And I think we're clear that Lena Lasher told you that it

5   was her department to destroy medication?

6   A.  Correct.

7   Q.  And she did it herself?

8   A.  Yes.

9   Q.  And it was also her statement to you that pills were

10  counted one by one or with a counting machine?

11  A.  I didn't encounter any counting machine in the pharmacy.

12  Q.  I'm sorry.  Then it's my fault.  I thought I heard you say

13  that.

14  A.  That was in the letter.  I never said that.  The letter

15  states it.

16  Q.  In the interview she said that pills were counted one by

17  one?

18  A.  Yes.

19  Q.  Now, was she talking about herself?

20  A.  She was talking about anyone, herself and others.

21  Q.  At the pharmacy?

22  A.  Correct.

23  Q.  And she made it clear that that was what she believed was

24  going on, correct?  She said that this is what -- this is the

25  policy at the pharmacy?

F5belas1                    Bat - cross

1              MR. RICHENTHAL:  Objection.

2              MR. FREEMAN:  I'll rephrase.  Bad question.

3    Q.  She told you that pills, medication at Hellertown Pharmacy

4    were counted?

5    A.  Yes.

6    Q.  She also talked about the sick policy, correct?

7    A.  Yes.

8    Q.  And indicated to you that, in words and substance, the

9    pharmacists weren't qualified to make diagnoses if people were

10   sick; they didn't have to come in before they came back; they

11   would need a doctor's note?

12             MR. RICHENTHAL:  Objection.  Misstates the testimony.

13             THE COURT:  Sustained.

14             MR. FREEMAN:  I didn't hear you.

15             THE COURT:  Sustained.

16   BY MR. FREEMAN:

17   Q.  Did you talk to Ms. Lasher about the sick policy being

18   changed; in other words, did you ask her if it was always the

19   way she described it?

20   A.  No.  Just talked about sick policy.

21   Q.  And although you didn't tell Lena Lasher that you had

22   received a complaint from someone, you were basing your

23   question about sick policy because of the complaint?

24   A.  Yes.

25   Q.  You indicated that you had never seen these kinds of totes

F5belasl                    Bat - cross

1    before?

2    A.  Never in a pharmacy.

3    Q.  Did you see them somewhere else?

4    A.  Yeah; Wal-Mart, Kmart, stores of that nature.

5    Q.  And is that one of the reasons you took pictures?

6    A.  Yes, definitely.

7    Q.  Normally you take pictures, but in this case you took more

8    pictures?

9    A.  Yes.

10   Q.  Would it be fair to say as an inspector with experience

11   inspecting pharmacies, having not inspected an online pharmacy

12   before, you didn't know what to make of this; is that fair?

13           MR. RICHENTHAL:  Objection.

14           MR. FREEMAN:  I'll withdraw the question.

15   Q.  Is it common for people to take up your offer to let them

16   submit a writing?

17   A.  I'd say about a good 85 percent.

18   Q.  And I think you testified that the response came in within

19   about three or four days?

20   A.  That is correct.

21   Q.  Did you -- well, obviously you met with Lena Lasher when

22   you sat down with her to interview her at the restaurant.

23   A.  Yes.

24   Q.  Had you met with her any other time?

25   A.  No.

F5belas1                      Bat - cross

1    Q.  When you came in to testify, did you recognize her?

2    A.  Yes, sir.

3              MR. FREEMAN:  I have nothing further.

4              MR. RICHENTHAL:  Very briefly, your Honor.

5    REDIRECT EXAMINATION

6    BY MR. RICHENTHAL:

7    Q.  Mr. Freeman asked you about a pill counting machine,

8    Mr. Bat?

9    A.  Yes.

10   Q.  Did you see one at Hellertown Pharmacy?

11   A.  No, I did not.

12   Q.  Did you see one at Palmer pharmacy?

13   A.  No, I did not.

14             MR. RICHENTHAL:  No further questions.

15             THE COURT:  I'm just curious:  How large is a pill

16   counting machine?

17             THE WITNESS:  It would be quite large.  They could

18   actually be like wall size.  It comes how many you want to put

19   in it.  So if you want to buy one that has a lot of pill

20   capacity, you can get really large ones.  Those are automatic.

21             Now, then I also referred to smaller ones that are

22   kind of quite old, and you don't see them too often because

23   it's now been automated.  So there are two kinds.

24             THE COURT:  But an automated one is fairly large?

25             THE WITNESS:  Yes, very large.  It would definitely

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F5belas1                    Bat - redirect

1    stick out when you walk in.

2    RECROSS EXAMINATION

3    BY MR. FREEMAN:

4    Q.  Are you saying you didn't see one, or are you saying that

5    there wasn't one there?

6    A.  I did not see one.

7            MR. FREEMAN:  Nothing further.

8            MR. RICHENTHAL:  I have a couple questions, your

9    Honor.

10   REDIRECT EXAMINATION

11   BY MR. RICHENTHAL:

12   Q.  Did you walk around all of Hellertown Pharmacy?

13   A.  Yes, we did.

14   Q.  Did you walk around all of Palmer pharmacy?

15   A.  Yes, we did.

16   Q.  Did you walk around the areas pills were stored?

17   A.  That is correct.

18   Q.  In both pharmacies?

19   A.  Yes.

20   Q.  Did you see a pill counter in either pharmacy?

21   A.  No, I did not.

22           MR. RICHENTHAL:  No further questions.

23           MR. FREEMAN:  One question.

24   RECROSS EXAMINATION

25   Q.  Did you see scales?

F5belas1                    Bat - recross

1    A.  Yes.

2    Q.  Weighing scales?

3    A.  Yes.

4    Q.  Do you remember how many?

5    A.  No.

6            MR. FREEMAN:  Thank you.

7            MR. RICHENTHAL:  We have no questions, further

8    questions for Mr. Bat.

9            THE COURT:  Thanks for coming back again.  I

10   appreciate it.

11           (Witness excused)

12           MS. GREENBERG:  The government calls Dr. Carmen

13   Catizone.

14    CARMEN CATIZONE,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MS. GREENBERG:

19   Q.  How are you?

20   A.  Good morning.

21   Q.  What is your occupation?

22   A.  I'm a pharmacist and executive director of the National

23   Association of Boards of Pharmacy.

24   Q.  Now, how long have you held that position as the executive

25   director of the National Association of Boards of Pharmacy?

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE
POSTAGE REQUIRED

*Retail*

GE PAID

Origin: 07938
01/13/20
3343950957-04

DAY ®

0 Lb 12.70 Oz
1004

/20

**B099**

JMBER

2140 57

FROM: Lema Lasher
16 Patton St.
High Bridge NJ 08829

RECEIVED
HARRISE___ PA

JAN 16 2020

PER_____
DEPUTY CLERK

TO: Clerk of the Court
US District Court for the
Middle District of Pennsylvania
Clerk of the Court
PO Box 983      228 Walnut
Harrisburg, PA 17108

To schedule free
Package Pickup,
scan the QR code.



USPS.COM/PICKUP

2018
x 9 1/2

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments.
Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service;October 2018; All rights reserved.

weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.